IN  THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

BRUCE DUNCAN #311083
    Petitioner                   :

    v .                      :    CIVIL ACTION NO. JKB-11-2275
                                             (Consolidated with GLR-11-2348)
MR. BOBBY SHEARIN, et al.,        :
    Respondents

## MEMORANDUM

Bruce Duncan ("petitioner" or "Duncan") filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 on August 12, 2011, challenging his convictions in the Circuit Court for Baltimore City.  ECF No. 1.  Respondents have answered (ECF No. 15), and Duncan has filed a reply (ECF No. 17).  After reviewing these papers, the court finds no need for an evidentiary hearing.  *See* Rule 8(a), *Rules Governing Section 2254 Cases in the United States District Courts*; *see also* 28 U.S.C. § 2254(e)(2).  For reasons set forth herein, the petition will be denied and dismissed and a certificate of appealability denied.

### Procedural History and Background

Duncan and Bernard Tubman were charged in the murder of Tony Watson and the attempted murders of Denise Lacruze, Latasha Jackson, Corey Cawthorne, and Ira Wise, and tried before a jury on August 9-16, 2002.  ECF No. 15, Exhibit 1, 2-10, 13 and Exhibit 13 at 1.

The following facts developed at trial were summarized on direct appeal by the Court of Special Appeals of Maryland:

> Kimberly Washington testified that, at approximately 12:30 a.m. on July 17, 2001, she was sitting on the steps of her home at 936 North Collington Avenue, in Baltimore City, with her boyfriend Tony Watson and her friends, Latasha Jackson and Denise Lacruze ("Ms. Neecy").  She noticed that two others known as "Chick" and "Bootie," who were later identified as Corey and Dale Cawthorne, were on the steps of a home two doors down from hers at 940

North Collington Avenue. Washington testified that two boys, identified as the appellants, approached, and appellant Tubman asked Watson if he sold "weed." Watson said no and the appellants left.

Later, the appellants returned. One of them hugged Ms. Neecy and gave her a kiss. Washington testified that Tubman asked Watson if he could "hit the blunt," meaning that he wanted to smoke from the marijuana cigarette that Watson had. Watson did not respond. Duncan sat on the steps of Washington's home. According to Washington, Duncan did not say anything, but began "digging" in Watson's pockets.

While Duncan was digging in Watson's pockets, Washington saw that Tubman had a gun. One of the appellants took Watson's marijuana cigarette. Washington then saw Tubman shoot Watson and she heard "gunshots going off." She ran down the street and inside the house at 940 North Collington Avenue. Washington later identified each appellant from separate photo arrays.

On the date of the shooting, Ira Wise lived at 940 North Collington Avenue with his fiancee, Marguerita Cavanaugh, and his nephew, Mark Perrin, who is also known as "Little Boo." At the time of the shooting, he was sitting on his front steps with his friend, Benjamin Lewis. Wise saw Watson sitting on the front steps of Washington's home along with Washington, Jackson and Ms. Neecy, drinking beer and smoking marijuana.

Wise saw two guys, whom he identified as appellants, walk up to the people gathered on the steps in front of Washington's home. One of the appellants hugged Ms. Neecy before walking back down the street and approaching two men known as "Bootie" and "Dale." Wise saw Tubman lean over Bootie and Dale and then saw Bootie and Dale remove their shoes and walk down the street with appellants. Wise went into his house and retrieved a handgun that he kept on the first floor. He then returned to the front steps with the weapon hidden behind his back.

Wise saw appellants go up to Watson and saw Tubman pull out a gun and point it at Watson's chest. He heard the girls start screaming and he saw Duncan going through Watson's pockets. Wise heard Tubman make "some sarcastic remark" like "this ain't your lucky day, or something like that." Wise saw Tubman shoot Watson. The girls and Bootie ran down the street towards Wise's home and Tubman shot at them. Wise testified that the girls

knocked him down running into his house. Wise testified that Bootie was shot and fell down in the vestibule of Wise's home.

According to Wise, both Tubman and Duncan pursued the people running away from Washington's steps, firing a gun at them. When they came to Wise's front steps, Wise started discharging his weapon and appellants ran away. When Wise went into his house, "[e]verybody was just screaming."  Wise saw that Ms. Neecy, Bootie and Latasha Jackson had been shot.  After Wise asked his fiancee to call the police, he noticed that he had been shot in the foot. Wise admitted that it was illegal for him to have a gun because he has a prior felony conviction. He gave the gun to his nephew, Perrin, and told him "to get rid of it." Wise testified that he identified the two appellants from photo arrays, and he also identified them in court.

Denise Lacruze, ("Ms. Neecy"), testified that Tony Watson was her nephew and that she was friends with Latasha Jackson and Kimberly Washington. On the night of the shooting, she was standing beside the steps in front of 936 North Collington Avenue drinking a beer. She admitted that at the time of the shooting she was a heroin user and had used heroin that morning. She testified that two guys walked up to the group of people sitting on the steps and that she knew one of the guys, appellant Tubman, whom she called "Black." She talked to him and hugged him. Tubman and the other guy left.

Later,  Lacruze saw the two return, and she noticed that Tubman had a gun in his hand.  She saw the other guy sit down on the steps and heard Tubman say "some words to Tony. Then he started firing." Lacruze ran into Wise's house and was shot in the ankle. She identified Tubman from a photo array, but was unable to identify Duncan.

Latasha Jackson testified that, at the time of the shooting, she lived at 936 North Collington Avenue with her three children and Kim Washington.  On the night of the shooting, she was sitting on the front steps with Watson, Washington and Ms. Neecy.  She stated that two men came up to Watson and asked if he sold "weed." One of them, Tubman, hugged Ms. Neecy and spoke to her. The two men then left.

Later that night, Jackson saw the two men come back to her house along with Dale and Corey who were not wearing any shoes. According to Jackson, the two men again approached Watson. Tubman asked Watson to let him hit the blunt. The other man who

3

was with Tubman took the blunt from Watson and went through Watson's pockets. Jackson saw Tubman pull out a gun. She heard Tubman say "don't take it personal" and then he shot Watson. Jackson testified that she and the others ran into the residence at 940 North Collington Avenue as shots continued to be fired. It was then that she realized that she had been shot. Jackson identified Tubman in a pre-trial photo array and in court as the shooter. She was unable to identify Duncan.

Baltimore City Police Detective Keith Benson was the primary investigator for the homicide. He testified that he responded to the scene of the shooting and directed the recovery of ballistics and other evidence from around 936 and 940 North Collington Avenue. Benson testified that Wise initially told him that someone else shot back at the shooter, but later admitted that he was the person who shot back and that he had given his handgun to Perrin to hide. According to Benson, gunshot residue was found on the hands of both Perrin and his friend, Bobby Huff, who was in Wise's home on the night of the shooting. Benson further testified that he compiled photo arrays and that Wise, Lacruze, Washington, and Jackson identified Tubman as the shooter, and that Wise and Washington were able to identify Duncan.

Assistant State Medical Examiner Joseph Pestaner testified that he conducted an autopsy on Tony Watson and concluded that the cause of death was a gunshot wound to the abdomen and that the manner of death was homicide.

ECF No. 15, Exhibit 13 at 2-7.  The jury convicted Duncan of 29 counts, including first-degree murder, felony murder, attempted second-degree murder, robbery with a deadly weapon, use of a handgun in the commission of a crime of violence, second-degree assault, theft under $500, conspiracy to commit murder, and conspiracy to commit robbery with a deadly weapon.  *Id*. at 1. On December 17, 2002, after merging a number of convictions, the court sentenced Duncan to a total of two concurrent life sentences plus forty years' incarceration. *Id.,* Exhibit 10 at 33-42.

Duncan and Tubman noted an appeal to the Court of Special Appeals, raising the following claims:

1.    Whether the trial court erred in giving the jury an improper "duty to

4

deliberate" instruction;

2.      Whether the trial court erred in allowing the prosecution to make a closing argument on rebuttal that improperly shifted the burden of proof to the defense;

3.      Whether the trial court erred in restricting the cross-examination of Detective Benson;

4.      Whether the trial court erred in permitting Detective Benson to testify as to certain matters;

5.      Whether the trial court erred in admitting irrelevant and/or prejudicial evidence and/or testimony; and

6.      Whether the trial court erred in excluding evidence of cocaine found in the murder victim's pocket and ammunition found in the house into which the shooting victims fled.

Exhibit 13 at 1-2; *see also* exhibits 11-12.  By unreported opinion filed on October 18, 2005, the Court of Special Appeals affirmed Duncan's judgment of conviction. *Id.*, Exhibit 13.  Duncan filed a petition for a writ of certiorari in the Court of Appeals of Maryland seeking review of the same six claims rejected by the Court of Special Appeals. *Id.*, Exhibit 14.  By order dated February 10, 2006, the Court of Appeals of Maryland declined further review.  *Id.*, Exhibit 15.

On February 1, 2007, Duncan filed a petition for post-conviction relief in the Circuit Court for Baltimore City.  *Id.*, Exhibit 1 & 16.  As amended, litigated, and construed, Duncan alleged that:

(1)      the prosecutor committed misconduct by

(a) withholding two police progress reports and
(b) improperly questioning a witness and shifting the burden to the defense;

(2)      appellate counsel was ineffective for failing to raise on appeal

(a) an issue regarding spousal immunity,
(b) a challenge to the sufficiency of the evidence,
(c) a challenge to the trial court's failure to clarify a jury question during deliberations, and

(d) a challenge to the State's failure to disclose the two police reports;

(3)  trial counsel was ineffective for failing to
(a) file a timely motion for modification of sentence,
(b) prepare an adequate defense, and
(c) sever his trial from his co-defendant's; and

(4)  the trial court erred in not issuing a missing witness instruction.

*Id.*, *Exhibits* 16-20.  By Memorandum Opinion filed December 23, 2009, Duncan was given the right to file a belated motion for modification of sentence, but otherwise denied post-conviction relief. *Id.*, Exhibit 20.  Duncan sought leave to appeal the ruling of the post-conviction court, in a filing that, as best as can be discerned, asserted the following claims:

(1)  the prosecutor committed misconduct by

(a) withholding two police reports and
(b) improperly questioning a witness and shifting the burden
to the defense;

(2)  appellate counsel was ineffective for failing to raise on appeal

(a) an issue regarding spousal immunity,
(b) a challenge to the sufficiency of the evidence, and
(c) a challenge to the State's failure to disclose the police reports;

(3)  trial counsel was ineffective for failing to prepare an adequate defense, and

(4)  the trial court erred

(a) in not issuing a missing witness instruction, and
(b) in not clarifying a jury question during deliberations.

*Id.*, Exhibit 21.  By unreported opinion filed on July 15, 2011, the intermediate appellate court summarily denied Duncan's application for leave to appeal; the court's mandate issued on August 15, 2011. *Id.*, Exhibit 22.

Duncan now alleges that his imprisonment is illegal because:

(1)  the prosecutor committed misconduct by

> (a) improperly suppressing evidence and knowingly using false testimony, and
> (b) improperly questioning a witness;

(2)    trial counsel was ineffective for failing to investigate the case; and

(3)    the trial court abused its discretion in its handling of a jury note.

ECF No. 1 at 6-17.

## Standard of Review

The federal habeas statute, 28 U.S.C. § 2254, as amended, provides a "highly deferential standard for evaluating state-court rulings," *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997); *see also Bell v. Cone*, 543 U.S. 447 (2005). This "highly deferential" standard is "difficult to meet" and "demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. __, ___, 131 S.Ct. 1388, 1398 (2011); *see also Harrington v. Richter*, 562 U.S. __, __, 131 S.Ct. 770, 786 (2011) ("If this standard is difficult to meet, that is because it was meant to be."). Petitioner carries the burden of proof to meet this standard. *See Pinholster*, 131 S.Ct. at 1398.

A federal court may not grant a writ of habeas corpus unless the state's adjudication on the merits: 1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States"; or 2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000) (O'Connor, J., concurring). "Under the ("unreasonable application") clause, a federal habeas court may grant the writ if the state court

identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*

That high standard has not been met in Duncan's case. Each issue he raises is addressed sequentially below.

## Analysis

### A. Prosecutorial Misconduct for Failing to Disclose Evidence/Using False Testimony

Duncan alleges that the prosecutor withheld a police progress report noting that two 380-caliber cartridge casings were found in the vestibule of Ira Wise's home at 940 North Collington Avenue. Duncan alleges the withheld report allowed the prosecutor to improperly bolster Wise's testimony that Wise was the only person at 940 North Collington to return fire, using a Tec-9, to protect himself and those who fled to his home after Tubman shot Watson. Duncan contends the 380-caliber casings were fired from a different gun by Mark Perrin, who was arrested that night at 940 North Collington after police investigating the shootings found evidence of drug distribution in Perrin's bedroom. Duncan contends that Perrin ("Boo") and an individual known only as "JR" were having a shoot-out over a female named "Missy," and that bullets from Perrin's 357 revolver killed Watson and injured others near the scene. Additionally, Duncan claims the prosecutor knew his witnesses committed perjury to support the State's theory of the case. Finally, Duncan claims the prosecutor withheld a report stating that an anonymous female caller contacted the police to provide information about "JR," "Boo," "Missy," and the shootout that contradicted the State's case. ECF No. 1 at 7-9.

Respondents contend that both aspects of Duncan's prosecutorial misconduct claim are procedurally defaulted. ECF No. 15 at 18, 22. They argue that the state post-conviction court

found Duncan's *Brady*[1] claim waived because, given the facts presented in post-conviction proceedings, the claim could have been raised on direct appeal and was not.  *Id.*, Exhibit 20 at 8, 16-17.   Respondents also contend that Duncan's claim that the prosecutor elicited perjured testimony was not pursued on direct appeal or in state post-conviction proceedings. *Id.*, Exhibits 16-21.

Before a petitioner may seek habeas relief in federal court, he must exhaust each claim presented to the federal court by pursuing remedies available in state court.  *See Rose v. Lundy*, 455 U.S. 509, 521 (1982).  This exhaustion requirement is satisfied by seeking review of the claim in the highest state court with jurisdiction to consider the claim. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 119 S. Ct. 1728 (1999); 28 U.S.C. § 2254(b) and (c).  In Maryland, this may be accomplished by raising certain claims on direct appeal and, with other claims, by way of post-conviction proceedings.  Exhaustion is not required if, at the time a federal habeas corpus petition is filed, the petitioner has no available state remedy.  *See Teague v. Lane*, 489 U.S. 288, 297-98 (1989).

Where a petitioner has failed to present a claim to the highest state court with jurisdiction to hear it, whether it be by failing to raise the claim in post-conviction proceedings or on direct appeal or by failing to timely note an appeal, the procedural default doctrine applies.  *See Coleman v. Thompson*, 501 U.S. 722, 749-50 (1991) (failure to note timely appeal); *Murray v. Carrier*, 477 U.S. 478 (1986) (failure to raise claim on direct appeal); *Murch v. Mottram*, 409 U.S. 41, 46 (1972) (failure to raise claim during post-conviction); *Bradley v. Davis*, 551 F. Supp. 479, 481 (D. Md. 1982) (failure to seek leave to appeal denial of post-conviction relief).

---

[1] *See Brady v. Maryland*, 373 U.S. 83 (1963) (exculpatory information must be disclosed to the defense prior to trial).

The procedural default doctrine bars consideration of a claim in a petition for habeas corpus in the absence of a showing of cause and prejudice or actual innocence. *See Murray*, 477 U.S. at 495; *Wainwright v. Sykes*, 433 U.S. 72, 86 (1977). Even where a petitioner fails to show cause and prejudice for a procedural default, a court must still consider whether it should reach the merits of the petitioner's claims in order to prevent a fundamental miscarriage of justice. *See Schlup v. Delo*, 513 U.S. 298, 314 (1995); *Bostick v. Stevenson*, 589 F.3d 160, 164 (4th Cir. 2009). The miscarriage of justice standard is directly linked to innocence. *Schlup*, 513 U.S. at 320. Innocence is not an independent claim; rather, it is the "gateway" through which a petitioner must pass before a court may consider constitutional claims which are defaulted. *Id.* at 315. The miscarriage of justice exception applies where a petitioner shows that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray*, 477 U.S. at 496.

Duncan was given an opportunity to explain why this claim should not be procedurally defaulted (ECF No. 16), and states the information concerning the alleged *Brady* violations was not discovered until direct appeal had been completed. ECF No. 17 at 4. Duncan also states that he attempted to present the claim of perjured testimony at his post-conviction hearing. *Id.* at 5. The undersigned concludes that although actual innocence is not apparent from the record, Duncan did attempt to present both aspects of this claim at his post-conviction hearing. Examination of the claim does not, however, provide grounds for relief from the judgment of conviction.

As to the first aspect of the claim, "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). The purpose of a *Brady* claim "is not

to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur." *United States v. Bagley*, 473 U.S. 667, 675 (1985). In order to prevail on a *Brady* claim, Duncan must establish that the evidence at issue is both favorable to the defense and that the unavailability of the evidence calls into question the result of the trial. *Id*. at 678. The Supreme Court has made it clear that there is no distinction between exculpatory evidence and impeachment evidence in the context of a *Brady* analysis. *See Giglio v. United States*, 405 U.S. 150, 154 (1972). There is no requirement that the guilty finding must be overturned unless suppression of the impeachment evidence so limited the defense's ability to cross-examine an accusing witness that "its suppression undermines confidence in the outcome of the trial." *Bagley*, 473 U.S. at 678.

The post-conviction court rejected Duncan's claim that the reports concerning the recovered casings and the anonymous telephone tip were not disclosed to the defense, finding Duncan's testimony concerning non-disclosure not credible.[2] ECF No. 15, Exhibit 20 at 16-17. Indeed, the reports contained markings and redactions consistent with documents that had been disclosed by the prosecution during pretrial discovery. *Id.* Further, Duncan was not shortchanged as a result of post-conviction counsel's failure to call trial counsel to testify; after Duncan presented his evidence and made argument at the December 3, 2009, post-conviction hearing, the post-conviction court provided him the opportunity to present testimony of his trial counsel with respect to this and any other allegation. *Id.,* Exhibit 18 at 82-95. Duncan not only failed to present this testimony, but the post-conviction court was informed that trial counsel

---

[2] The motions hearing reflects that counsel for the defense was fully informed of the police investigation and the subsequent ballistics analysis, which was a more accurate identification of the ballistics evidence initially found on the scene the morning of the shooting as well as evidence found in a later search of the area. ECF No. 15, Exhibit 2 at 15-35. In fact, one of the police reports Duncan claims was not disclosed was attached by Duncan to his petition for a writ of certiorari on direct appeal, *id.,* Exhibit 14, further confirming that the document had been disclosed in due course by the prosecution. No evidence before the post-conviction court suggests that the police reports in question were not disclosed to the defense.

would not testify favorably on Duncan's behalf.  *Id.,* Exhibit 21 (December 9, 2009, letter to Judge Bernstein from Assistant Public Defender David Russell, wherein Russell states that calling trial and appellate defense counsel would not be in Duncan's "best interest"); *see also* Exhibit 18 at 28-29 (post-conviction counsel declining the opportunity to have defense trial counsel testify).  The record thus fully supports the post-conviction court's finding that the first element of *Brady* - a failure to disclose - was not demonstrated.  Further, Duncan failed to prove the materiality element of *Brady* given, as the post-conviction court concluded, Duncan's theory ended "with the attempted murder of Denise Lacruze, Latasha Jackson, Corey Cawthorn, the death of Tony Watson, and conviction and incarceration of Petitioner and his co-defendant." *Id.*, Exhibit 20 at 16.[3]  Based on the record before it, the state post-conviction court's rejection of Duncan's claim was a reasonable application of *Brady* and its progeny.

Duncan's additional claim that the prosecutor elicited perjured testimony appears to be procedurally defaulted but in any event fails.  Even if Perrin was the second shooter defending 940 North Collington with a 357 revolver loaded with 380 ammunition, there is no real debate that Duncan fully participated with Tubman in the unjustified shootings that resulted in Watson's death and the wounding of several others.[4]  Accordingly, this otherwise defaulted claim does not state a basis for relief under 28 U.S.C. § 2254(d).

### B.  Prosecutorial Misconduct by Improperly Examining a Witness

At trial, the prosecution called Ruth August, who had worked with Duncan's wife, Latonya "Mookie" Summerville, at a local restaurant.  August testified the two women were

---

[3] In other words, whatever the provocation, Duncan and Tubman were identified as responsible for Watson's murder and were in the thick of the exchange of gunfire that resulted in injury to the other victims who fled to Wise's home.

[4] As noted by respondents, Duncan conceded at the post-conviction hearing that he and Tubman were present and engaged in the shooting.  ECF No. 15, Exhibit 18 at 23.

friends.  August frequently visited the Duncan-Summerville home, where she met and befriended

Bernard Tubman.  ECF No. 15, Exhibit 6 at 94-98.  After Tubman and Duncan were arrested,

Duncan (known to August as "Dino,") wrote and telephoned August encouraging her to testify

on his behalf to establish an alibi for his whereabouts the night of the shooting by claiming

Duncan, Mookie, and August were all attending a party at their home.  *Id.,* Exhibit 6 at 99-113.

On cross-examination, Duncan's counsel showed August a photograph depicting August,

Mookie, and four other people at a party held earlier that summer, and suggested that Duncan's

letter merely referenced that party, not the night of the murder.  *Id.* at 117-120.  On redirect, the

prosecutor asked August whether she knew if Duncan's wife "is still alive?"  *Id.,* Exhibit 6 at

122.  Duncan's counsel objected based on relevance, *id.* at 123; Tubman's counsel attempted to

invoke spousal privilege, *id.* at 123-24;[5] and the prosecutor argued that the question was asked to

counter the defense tactic of inferring Duncan and his wife were at a party the night of the

shooting, without having to call the wife to testify.  *Id.* at 123-124.

Duncan contends the prosecutor's question "elicited testimony that created a negative

inference."  ECF No. 1 at 11.  Respondents correctly note that the claim fails to specify what

federal constitutional right or provision has been violated by the question, a requirement under

28 U.S.C. § 2254(a).  ECF No. 15 at 23; *see Wilson v. Corcoran*, __ U.S. __, 131 S. Ct. 13, 14

(2011) (federal court may not issue writ of habeas corpus to state prisoner whose confinement

does not violate federal law); *Rose v. Hodges*, 423 U.S. 19 (1975); *Estelle v. McGuire*, 502 U.S.

62 (1991).

The post-conviction court found that Duncan's claim of prosecutorial misconduct by

---

[5] Spousal privilege was not an issue in this case; apparently, Duncan's wife gave a statement to police the night
Duncan was arrested indicating he was not at home at a party the night of the incident and she remembered the night
because he came home that evening and told her details of the shooting.  Clearly, the defense did not intend to call
the wife to testify. ECF No. 15, Exhibit 6 at 124.

"improper questioning and argument that touched on the amorphous spousal privilege allegations, thereby shifting the burden to petitioner," was waived as it was not raised on direct appeal.  ECF No. 15, Exhibit 20 at 8.  The post-conviction court also examined the issue in the context that appellate counsel was ineffective for failing to raise the issue of spousal privilege on appeal, and found it:

> meritless as there is no spousal privilege [p]etitioner could raise. [Citation omitted].  First, there is no indication that [p]etitioner's wife invoked the privilege.  At his hearing, [p]etitioner admitted that she could not be located during trial.  Second, it is unclear whether [p]etitioner would even have standing to raise the issue on appeal because the wife-witness, not the defendant, holds the spousal privilege.  Finally, [p]etitioner did not present sufficient evidence to show that but for appellate counsel's omission, there was a substantial possibility of a reversal of his conviction…

*Id.*, Exhibit 20 at 14.  This determination is supported by the testimony at the post-conviction hearing, *id.*, Exhibit 18 at 35-38, and provides no basis for granting federal habeas corpus relief.

## C.  Ineffective Assistance of Counsel

Duncan complains that trial counsel failed to fully investigate his case and, as a result, failed to timely uncover *Brady* evidence, including the anonymous telephone call to the police and the recovery of the large-caliber bullet fragment.  ECF No. 1 at 11, 16-17.

The two-part test announced in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), governs the standard for examining ineffective assistance claims.  First, a petitioner must demonstrate that the performance of his counsel was deficient by falling below an objective standard of reasonableness.  *Id.*  Second, a petitioner must demonstrate that he suffered prejudice as a result of the defective performance.  *Id.*  The Supreme Court has made it clear that courts should "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that,

under the circumstances, the challenged action might be considered a sound trial strategy." *Id.* at 689.  In the context of a § 2254 proceeding, it is not sufficient to convince the federal habeas court that the state court merely applied *Strickland* incorrectly.  Rather, a petitioner must show that the state court applied *Strickland* to the facts in an objectively unreasonable manner.  *See Bell v. Cone*, 535 U.S. 685, 698-99 (2002).

The first prong of the *Strickland* test requires an evaluation of counsel's performance in light of an "objective standard of 'reasonably effective assistance' under 'prevailing professional norms.'" *Briley v. Bass*, 750 F.2d 1238, 1247 (4th Cir. 1984).  As noted in the *Brady* discussion above, review of the police records (which contained redactions) indicates that trial counsel was aware of information concerning "Missy" and the recovered bullet casings.  The information, however, does nothing to bolster Duncan's defense; whether a second shooter fired back at Tubman and Duncan (and in doing so may have injured a fleeing victim), or had an additional or ulterior motive to return gunfire is not material, given that multiple victims of the shooting identified Tubman and Duncan as the initiators of the attack.  The post-conviction court found that trial counsel's performance was not deficient; given the facts of this case, the undersigned agrees.  This ground provides no basis for relief under 28 U.S.C. § 2254(d).

**D.    Trial Court Error**

Duncan asserts that the trial court abused its discretion by failing to provide further instruction during deliberation when presented with a note from the jury.  ECF No. 1 at 11.  Duncan states:

> The jury sent the judge a note which read "How deeply does guilty by association the law. By not addressing the note they were mislead to believe that having any form of relationship with another individual means you're guilty of what they do.

*Id.* (*sic*).  The trial court's failure to reinstruct the jury after receipt of the note was not raised on appeal.  It was, however, raised at post-conviction in the context of a claim of ineffective assistance of appellate counsel, not as a claim of trial court error.  ECF No. 15, Exhibit 18 at 48; Exhibit 20 at 47-49, 116-18.  Thus, even assuming it meets the threshold standard of cognizability[6] by stating a due process claim, this ground for relief is procedurally defaulted under the principles previously discussed.

Duncan's concerns about the trial court's response to the jury note were examined by the post-conviction court in the context of ineffective assistance of appellate counsel for failing to challenge the trial court's action on the jury note on direct appeal.  The post-conviction court noted that the trial court provided the jury a copy of the jury instructions, and thus there was no need to repeat the aiding and abetting instruction.  ECF No. 15, Exhibit 10 at 15, n. 4.  The court further stated:

> Petitioner alleges that appellate counsel was ineffective by not raising on appeal, the issue of whether the trial court erred  by  not clarifying a question from the jury during deliberations. Yet again, Petitioner failed to meet his burden by not putting on evidence sufficient to rebut the presumption that appellate counsel selected carefully the issues for appeal.  *See Stoval* , 144 Md. App. 711. The discussion over the question was whether to re-instruct the jury as to aiding and abetting. R. August 16, 2002 at 7. Further instruction would have likely been to Petitioner's detriment. *See* MPJI-Cr 3:39.  Finally, although Petitioner's co-defendant's counsel suggested a re-instruction, Petitioner's trial counsel suggested an almost identical response to the response the trial court sent to the jury. R. August 16, 2002 at 7-8. Therefore, I find that even though Petitioner did not meet his burden, neither was he prejudiced by appellate or trial counsel's conduct as to [the] allegation…

---

[6] In order to merit federal habeas corpus review, a claim must allege violation of a particular federal constitutional or statutory right.  *See* 28 U.S.C. § 2254(a) (authorizing a federal court to entertain a state prisoner's habeas petition "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States"); *Wilson*, 131 S. Ct. at 14 ("Federal courts may not issue writs of habeas corpus to state prisoners whose confinement does not violate federal law.").

The post-conviction court's ruling is supported by the record.  During deliberations, the jury sent a note to the court which inquired "How deeply does guilt by association (the law)?" ECF No. 15, Exhibit 8 at 13-14 (*sic*).  After discussion with counsel, the trial court responded to the note by telling the jury to refer to the tape-recorded instructions that were provided to them. *Id*. at 14-21.  The trial court's action was not only proper, it was effective.  Duncan was acquitted of attempted first- and second-degree murder, first-degree assault, conspiracy to commit murder, and both weapons charges as to victim Ira Wise; acquitted of attempted first-degree murder, first-degree assault, conspiracy to commit murder, and both weapons charges as to victim Denise Lacruze; acquitted of attempted first-degree murder, first-degree assault, conspiracy to commit murder and both weapons charges as to victim Latasha Jackson; and acquitted of attempted first-degree murder, conspiracy to commit murder, and one weapons charge as to victim Corey Cawthorne.  *Id.*, Exhibit 8 at 27-31.  Relief is not warranted under 28 U.S.C. § 2254(d).

### Certificate of Appealability

A certificate of appealability ("COA") shall not issue without "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2) (2000).  A petitioner satisfies this standard by demonstrating that reasonable jurists would find that an assessment of the constitutional claims is debatable and that any dispositive procedural ruling dismissing such claims is likewise debatable.  *Miller-El v. Cockrell*, 537 U.S. 322, 336-38 (2003); *Rose v. Lee*, 252 F.3d 676, 683-84 (4th Cir. 2001).  Reasonable jurists would not find petitioner's claims debatable.

### Conclusion

For the reasons stated herein, Duncan's petition for writ of habeas corpus is DENIED and a certificate of appealability shall not issue.  A separate order follows.

DATED this 12th day of October 2012.

BY THE COURT:


_____/s/_____
James K. Bredar
United States District Judge